GARY K. SPRINGSTEAD
Attorney for Defendant, Michael J. Buntenbah
Michigan Attorney (P59726)
Admitted *pro hac vice* to represent Mr. Buntenbah in this case (ECF No. 92)
SPRINGSTEAD BARTISH BORGULA & LYNCH
60 Monroe Center St., N.W., Suite 500
Grand Rapids, Michigan 49503
Tel: (616) 458-5500
gary@sbbllaw.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

_____

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| Plaintiff, | CR NO. 19-CR-00099-07 DKW |
| vs. | Hon. Derrick K. Watson<br>Hon. Kenneth J. Mansfield |
| MICHAEL J. BUNTENBAH,<br>    aka "Mike B," | **Defendant's Opposition to Government's Motion to Detain Michael J. Buntenbah** |
| Defendant. | |

The defendant, Michael J. Buntenbah, by and through counsel, Gary K. Springstead of SPRINGSTEAD BARTISH BORGULA & LYNCH, PLLC, opposes the government's motion for detention. (*See* ECF No. 26, Mot. to Detain Defendant

1

Michael J. Buntenbah, PageID.274-78; ECF No. 26-1, Brief in Support of Mot. to Detain Michael J. Buntenbah, PageID.279-94.) The detention hearing is set for July 24, 2020, at 9:30am. (ECF No. 62, Scheduling Order.)

## I. FACTS

**A.  The Nature and Circumstances of the Offense, *i.e.*, the Superseding Indictment**

The 22-count Superseding Indictment charges Mr. Buntenbah in three counts: (1) conspiracy to commit assault in aid of racketeering from sometime between "the late 1990s" and 2018 (Count 10); (2) conspiracy to distribute and possess with intent to distribute 5 kilograms or more of cocaine during July 2014 (Count 15); and (3) conspiracy to distribute and possess with intent to distribute controlled substances from about 2016 to about 2018 (Count 16). (ECF No. 3, Superseding Indictment, PageID.33, 37-38.)

The Superseding Indictment does not charge Mr. Buntenbah with any criminal activity after 2018. (*Id.*) His name does not appear anywhere in the 10-page description of Miske Enterprise, its members, or the racketeering conspiracy. (*Id.*, PageID.14-24.) He is not named in the charges alleging firearms offenses; robbery; bank fraud; or conspiracy to commit kidnapping, arson, robbery, chemical weapons crimes, financial crimes, fraud, obstruction of justice, witness tampering, murder, or murder-for-hire. (*Id.*, PageID.13-54.)

2

The counts in which Mr. Buntenbah is charged are not central to the conspiracy charges alleged elsewhere in the Superseding Indictment and are not ongoing offenses:

- **Count 10**, conspiracy to commit assault in aid of racketeering, is related to Mr. Buntenbah's employment as a bouncer at a night club – a role that carries an inherent risk of physical altercation. (*Id.*, PageID.33; ECF No. 26-1, Brief in Support of Mot. to Detain Michael J. Buntenbah, PageID.287 ("Buntenbah was identified on multiple occasions as the assailant in assaults which took place at the club.")) These alleged assaults happened at least two years ago, no later than 2018. (ECF No. 3, Superseding Indictment, PageID.33.)
- **Count 15**, the cocaine charge, alleges that the conspiracy started and ended six years ago in July 2014. (*Id.*, PageID.37.)
- **Count 16**, the other drug conspiracy charge, lumps Mr. Buntenbah in with 10 other defendants and alleges that the conspiracy ended two years ago in 2018. (*Id.*, PageID.38.)

### B. Bond for Co-Defendants

This Court has, so far, denied the government's motions to detain two co-defendants, Preston M. Kimoto and Hunter J. Wilson, and granted the motion to

detain a third co-defendant, Norman L. Akau, III. (ECF No. 72 (Kimoto); ECF No. 73 (Wilson); ECF No. 76 (Akau).) Unlike Mr. Buntenbah, the Superseding Indictment names all three of those co-defendants as members of Miske Enterprise and involved in the racketeering conspiracy, including the associated acts of murder, kidnapping, arson, robbery, fraud, chemical weapons, financial crimes, obstruction of justice, and witness tampering. (ECF No. 3, Superseding Indictment, PageID.14-24.) And, like Mr. Buntenbah, the Superseding Indictment charges all three of those co-defendants in Count 16, conspiracy to distribute and possess with intent to distribute controlled substances. (ECF No. 3, Superseding Indictment, PageID.37-38.)

The results of those detention hearings are as follows:

- **Kimoto:** The Court set bail at $50,000 for Mr. Kimoto, secured by a $5,000 cash deposit. (ECF No. 72, Minutes of Bond Hearing for Preston M. Kimoto, PageID.474.) The Court placed Mr. Kimoto on home detention with location monitoring, released him to a third-party custodian, and imposed other restrictions designed to ensure his appearance at future proceedings. (*Id.*, PageID.474-77.)
- **Wilson:** The Court released Mr. Wilson on a $50,000 unsecured bond to a sober living residence (MOKA House) with similar restrictions as

those imposed on Mr. Kimoto. (ECF No. 73, Minutes of Bond Hearing for Hunter J. Wilson, PageID.478-80.)

- **Akau:** The Court granted the government's motion for detention against Mr. Akau, whom the government alleges was "one of the key perpetrators in the 2016 armed Hobbs Act robbery of 'Victim-4,'" and that Mr. Akau drove alone, exited his vehicle "impersonating a police officer wearing a badge and holding a walkie-talkie," and "instructed Victim-4 to step out of the vehicle in which he was riding." (ECF No. 35-1, Brief in Support of Mot. to Detain Norman L. Akau, III, PageID. 380.) Mr. Akau and other co-defendants then, brandishing firearms, "stole approximately five pounds of methamphetamine belonging to Victim-4 from the vehicle's trunk." *(Id.)* Mr. Buntenbah, unlike Mr. Akau, is not implicated in the Hobbs Act robbery nor accused of any firearms-related offenses.

C. **Mr. Buntenbah's History and Characteristics**

<u>Length of Residence in and Family Ties to the Community</u>

Mr. Buntenbah, age 48, has lived in Hawaii since he was eight years old and has lived in the same house in Kaneohe for the past 20 years. (Pretrial Services Report, p.2.) He shares the property – which includes two rental units – with his

23-year-old son, his son's girlfriend and their two children (ages six and three). (*Id.*, p.2-3.) Mr. Buntenbah's 17-year-old son also lives there part time. (*Id.*, p.2.) Mr. Buntenbah's one-year-old son lives 30 minutes away with the child's mother, with whom Mr. Buntenbah has had a long-time relationship on and off for the past seven years. (*Id.*)

Mr. Buntenbah's half-sister, a former paralegal in California who is supportive of Mr. Buntenbah, stated that the family would be able to post a secured cash bond of up to $100,000. (*Id.*) She is "confident her brother will make all his court appearances and comply with any conditions of release imposed by the Court." (*Id.*) She also "noted she is considering moving back to Hawaii if that would help her brother during the pendency of his case." (*Id.*)

Mr. Buntenbah's ex-wife, who was in a relationship with Mr. Buntenbah for 10 years, "confirmed that she and the defendant have 'co-parented' their son very well," that her relationship with Mr. Buntenbah is "good," and that Mr. Buntenbah is "amazing with his children and is very involved in their upbringing." (*Id.*, p.3.)

Mr. Buntenbah's 23-year-old son and his girlfriend are gainfully employed in the local area – he as a part-time special effects movie union member and she as a full-time realtor. (*Id.*) The 23-year-old son, who has no criminal background, agreed to serve as third-party custodian for Mr. Buntenbah if released and "does

not think the defendant would have any issues complying with Location Monitoring if ordered by the Court." (*Id.*)

### Employment

Mr. Buntenbah completed high school and three years of college. (*Id.*) He has been self-employed for the past nine years and is the owner of a clothing store at the mall and a clothing brand featured in a number of local shops on Oahu. (*Id.*, p.3-4.) Despite some business success, he has also experienced financial trouble, including monthly expenses currently exceeding current income. (*Id.*, p.4-5.) He has significant mortgages due on two properties, including his primary residence in Kaneohe where his sons, one of their girlfriends, and the two young children reside. (*Id.*) Despite financial challenges, Mr. Buntenbah and his company have "provided regular volunteer assistance during the COVID-19 pandemic" to the Hawaii Food Bank. (*Id.*, p.5.)

### Physical and Mental Health and Past Conduct

Mr. Buntenbah has no mental health issues or substance abuse problems other than a very common anxiety disorder. (*Id.*, p.5-6.) He has minimal criminal history, with his last conviction being in 2013 for refusing to submit to a blood/breath/urine test. (*Id.*, p.6.) He has no felony convictions and no outstanding warrants. (*Id.*, p.7.) He has never been charged with a firearms offense, including in the Superseding Indictment. (*Id.*)

## II.  LAW AND ARGUMENT

Title 18 U.S.C. § 3142(a) sets forth the options for pretrial release, while 18 U.S.C. § 3142(g) identifies the factors to be considered. Those factors are:

- the nature and circumstances of the offense charged (§ 3142(g)(1));

- the weight of the evidence (§ 3142(g)(2));

- the history and characteristics of the person charged (§ 3142(g)(3)); and,

- the nature and seriousness of the danger to any person or the community that would be posed by the person's release. (§ 3142(g)(4)).

*See United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986). As the following argument will demonstrate and the Pretrial Services Report indicates, there are standard conditions of bond that would ensure Mr. Buntenbah's appearance in court and the safety of the community.

The Bail Reform Act requires the least restrictive condition or combination of conditions that will reasonably assure the appearance of the person and protect the public. 18 U.S.C. § 3142(c)(2); *United States v. Motamedi,* 767 F.2d 1403, 1407 (9th Cir. 1985). The Court may only detain Mr. Buntenbah if it finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community

. . . ." 18 U.S.C. § 3142(e)(1).

## A. Danger to the Community

While the Government avers that Mr. Buntenbah should be detained, in part, because he is a danger to the community, the facts of the case and Mr. Buntenbah's history and characteristics suggest otherwise.

Mr. Buntenbah's alleged participation in the offenses, even as charged, appears tangential. The Superseding Indictment paints him as the least culpable person charged and does not allege he was even a member of the Miske Enterprise or the racketeering conspiracy. His alleged offenses relate to assaults while he was a bouncer (Count 10) and non-violent participation in a drug trafficking conspiracy (Counts 15 and 16), one of which allegedly occurred six years ago for as little as a single month (Count 15).

Mr. Buntenbah has never been charged with a firearms offense, and he has no prior felony convictions. He is a business owner, a good father by all accounts, and a volunteer. His last alleged involvement in any criminal activity contained in the Superseding Indictment was two years ago, in 2018.

Mr. Buntenbah's family ties, employment, length of residence in the community, community ties, past conduct, relative lack of criminal conduct, and record concerning appearance at court proceedings all weigh in favor of release. 18 U.S.C. § 3142(g). There are conditions or combinations of conditions of bond that

will assure the safety of the community. Additionally, based on the allegations in the Superseding Indictment, he poses less of a risk of danger to the community than either of the other two co-defendants already released on bond.

If, as the Government suggests, Mr. Buntenbah is such a danger to the community that no combination of conditions can protect the public from him, then perhaps they should have moved more quickly to arrest Mr. Buntenbah after the alleged incident in 2014 or even after he sat down with the government in a reverse proffer well before the original indictment. The fact that he remained free and has had no further charges filed against him since 2016 militates in favor of release and suggests there are conditions that can be imposed to protect the public.

In sum, the Government has failed to establish by clear and convincing evidence that dangerousness justifies detaining Mr. Buntenbah. *See Motamedi*, 767 F.2d at 1406-07; *United States v. Aiken*, 898 F.2d 104 (9th cir. 1990).

**B.     Risk of Flight**

The same factors under Section 3142(f) also weigh against Mr. Buntenbah being a risk of flight. Mr. Buntenbah has deep roots in Hawaii, including three children in the local area and a business. He has supportive, gainfully-employed, law-abiding immediate family members. He has a one-year-old son. *See Motamedi*, 767 F.2d at 1408 , (9th Cir. 1985) (reversing detention order upon finding that strong family ties to the area, absence of drug or alcohol problems,

lack of criminal history, and availability of a substantial bond all militate towards the granting of bail rather than detention).

There are conditions or combinations of conditions of bond that will assure his appearance at future court proceedings. Home detention and GPS location monitoring present the most secure options for pretrial supervision short of confinement and are sufficient to ensure Mr. Buntenbah's appearance, along with substantial financial bonds.

**C.    Conditions of Bond**

A $50,000 cash deposit is sufficient to ensure Mr. Buntenbah's appearance, along with a $150,000 bond secured by his primary residence as proposed is sufficient deterrent ensure Mr. Buntenbah does not violate the conditions of bond. This is especially considering the unsecured and $50,000 bonds set respectively for the two co-defendants who are allegedly more centrally involved in Miske Enterprises and the violent racketeering conspiracy charged.

Mr. Buntenbah's 23-year-old son and his son's girlfriend live full-time in the residence with their two young children. The residence includes two rental units that generate income for the family and help pay the mortgages. Losing that residence would mean displacing Mr. Buntenbah's son and his son's family and placing Mr. Buntenbah, his businesses, his business partners, and his family in financial jeopardy. Although Mr. Buntenbah has equity in the property, he also has

11

a mortgage on that and one other property and, at present, his monthly overall expenses exceed his monthly income.

The Eighth Amendment prohibits courts from setting excessive bail. U.S. Const. amend. VIII. "The Excessive Bail Clause prevents the imposition of bail conditions that are excessive in light of the valid interests the state seeks to protect by offering bail." *Galen v. Cty of Los Angeles*, 477 F.3d 652, 660 (9th Cir. 2007) (internal citation omitted). Where the government's interest in preventing danger or flight can be addressed by release on bail, "bail must be set by a court at a sum designed to ensure that goal, and no more." *United States v. Salerno*, 481 U.S. 739, 754, (1987); *Stack v. Boyle*, 342 U.S. 1, 5, 72 S. Ct. 1, 96 L. Ed. 3 (1951) (stating that "bail set at a figure higher than an amount reasonably calculated [to ensure the defendant's presence at trial] is 'excessive' under the Eighth Amendment").

The fact that a defendant *could* pay the bail is not the measuring stick for whether or not bail is excessive. The test for excessive bail is not whether the defendant is financially capable of posting bond but rather whether the amount of bail is reasonably calculated to assure the person's appearance at trial. *See, e.g.*, *United States v. Beaman*, 631 F.2d 85 (6th Cir. 1980); *United States v. Wright*, 483 F.2d 1068 (4th Cir. 1973). The bail should be set at an amount not more than required to meet the goal of appearance. The fact that an individual has in his

12

possession sufficient money to pay bail does not estop him from challenging excessiveness. *Wagenmann v. Adams*, 829 F.2d 196 (1st Cir. 1987).

Mr. Buntenbah's ongoing businesses keep the family afloat financially, in the face of two mortgages and financial liabilities. Pretrial detention would mean a significant amount of time away from his businesses without contributing to the family earnings. That time is likely to be extensive in light of the complexity of a multi-count, multi-defendant conspiracy case where pretrial continuances and motions can be expected. The family can afford $50,000 in cash, and requiring more would be excessive. The loss of $50,000 would be substantial to Mr. Buntenbah and his family, the threat of which is sufficient to ensure his appearance.

If any property is required to secure the bond set by this Court, Mr. Buntenbah requests that he be released first on a cash deposit while he undergoes the lengthy process required to appraise and post security on the mortgage. As described in Local Criminal Rule 46.3(b), a property bond requires that, before the person is released, the title owner of the property (in this case, a bank or mortgage company) must "furnish a mortgage on the property in favor of the clerk"; the mortgage "shall be recorded in the State of Hawaii Bureau of Conveyances or filed with Registrar of the State Land Court"; and the "value of the property must be established by evidence satisfactory to the court," which could require an appraisal.

It can be expected that during COVID-19 and the various government shutdowns and business restrictions, that process could be particularly onerous to complete in a timely manner, particularly with Mr. Buntenbah attempting to orchestrate everything from confinement.

**D.     COVID-19 and Access to Counsel**

The Court should consider the risks associated at present with ongoing confinement in light of the COVID-19 pandemic. Jails and prisons are particularly susceptible to outbreak, where ventilation is minimal and crowded shared living conditions are standard. Due to COVID-19 safety precautions, jails and prisons are placing additional restrictions on inmates to reduce the spread, including in many cases by limiting access to communal telephones, visitors, and legal phone calls that would require a prisoner to leave his cell.

In fact, counsel scheduled a legal call with Mr. Buntenbah to prepare this brief and discuss the upcoming detention hearing. The call was to be initiated by the confinement facility at an unspecified time during the day on July 22, 2020. Counsel confirmed that the call was on the approved list for the facility and monitored the phone all day, but the call came through outside the prearranged timeframe when only local counsel was available. As a result, counsel was unable to discuss the detention issues directly with Mr. Buntenbah prior to filing this brief.

These types of delays and complications in communication can be expected to continue during the COVID-19 outbreak.

The precautions within jails and prisons, while absolutely necessary to protect the life and safety of staff and inmates, has interfered with and will continue to interfere with regular and predictable access to and communication with counsel and the preparation of a defense. Exposing Mr. Buntenbah to the risk of COVID-19, and adding to the inmate population during this outbreak, is unnecessary.

### III. CONCLUSION

Mr. Buntenbah respectfully requests that his Court release him with a $50,000 cash security bond, a property bond, home detention with GPS location monitoring, along with other standard conditions of release. These conditions are sufficient to ensure Mr. Buntenbah's appearance at future proceedings and to protect the community.

Dated:     July 24, 2020         */s/ Gary K. Springstead*
*Refiled with admin corrections per*     GARY K. SPRINGSTEAD
*Court's instructions on July 24, 2020*     Counsel for Defendant
                                                          28A W. Main St.
                                                          Fremont, MI 49412
                                                          (231) 924-8700
                                                          gary@sbbllaw.com