GARY K. SPRINGSTEAD
Attorney for Defendant, Michael J. Buntenbah
Michigan Attorney (P59726)
Admitted *pro hac vice* to represent Mr. Buntenbah in this case (*See* ECF 92)
SPRINGSTEAD BARTISH BORGULA & LYNCH
60 Monroe Center St., N.W., Suite 500
Grand Rapids, Michigan 49503
Tel: (616) 458-5500
gary@sbbllaw.com

DAVID HENDRICKSON
Law Office of David S. Hendrickson
6370 Hawaii Kai Dr Apt 3
Honolulu, HI 96825
808-729-8937
Email: david@themilitarydefenselawyer.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

_ _ _ _ _ _ _ _ _ _ _ _ _

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| Plaintiff, | CR 19-CR-00099-07 DKW-KJM |
| v. | Hon. Derrick K. Watson |
| | Hon. Kenneth J. Mansfield |
| MICHAEL J. BUNTENBAH, | |
| Defendant. | |
| _____/ | |

**DEFENDANT BUNTENBAH'S REQUEST TO SET ASIDE FORFEITURE AND RESPONSE TO UNITED STATES' MOTION FOR FORFEITURE**

*Per Local Rule 7.3: A hearing on the following is to be held 2/27/2024 at 2:30 pm in Aha Kupono before Chief Judge Derrick K. Watson. The trial is ongoing for docket number 19-CR-00099-07 DKW-KJM.*

# I. SUMMARY

Mr. Michael Buntenbah opposes the Government's motion to forfeit his bond and respectfully submits that all or part of the forfeiture should be set aside pursuant to Fed. R. Crim. P. 46(f)(2). "Justice does not require bail forfeiture" for the following reasons:

(1) Prior to this incident, Mr. Buntenbah had been on pretrial release for more than four years without incident and, in an ordinary case, the case would have been resolved already, with his bond no longer in jeopardy;

(2) Mr. Buntenbah readily accepted responsibility for his actions, pled no contest to the violation, and appeared as directed by pretrial services knowing full-well that he was likely to be arrested at the time;

(3) He has appeared for all court appearances as required and complied with all the other conditions of his bond;

(4) While committing a violation of federal, state or local law on bond is undoubtedly a serious matter, Mr. Buntenbah's actions appear to constitute a misdemeanor offense—that is, an assault or battery—which is a relatively minor violation of state law; and

(5) On the night of the incident, Mr. Buntenbah became extremely agitated with the victim because the victim previously threatened to kill Mr. Buntenbah, and Mr. Buntenbah heard that the victim was calling Mr. Buntenbah a "rat," based on his agreement to cooperate with the government's investigation in the instant case—a dangerous accusation, given the nature of the case.

Moreover, the Government's Motion for Forfeiture fails to include two critical details regarding the incident: (1) that the victim recanted his statement to the FBI, made at the beginning of his interview, claiming Mr. Buntenbah called him a "rat"; and that (2) when specifically asked by the FBI at the end of the interview to confirm

that Mr. Buntenbah called him a "rat," the victim denied Mr. Buntenbah actually made such a statement. Obviously, the failure to include these details is troubling because it could mislead the Court to believe Mr. Buntenbah's hostility toward the victim was aimed at intimidating a cooperating witness, rather than—as Mr. Buntenbah asserts—because the victim threatened to kill Mr. Buntenbah and harassed Mr. Buntenbah for cooperating with the government.

Therefore, Mr. Buntenbah respectfully submits that that justice does not require forfeiture of his bond and asks the Court to set aside all or part of the forfeiture of his bond. Fed. R. Crim. P. 46(f)(2)(B); *United States v. Nguyen*, 279 F.3d 1112, 1118 (9th Cir. 2002).

## II.    BACKGROUND AND FACTS

On July 18, 2019, the Government issued its Indictment, charging Mr. Buntenbah with one count of conspiracy to distribute cocaine. (ECF No. 1.) Mr. Buntenbah was released on bond on September 23, 2020. (ECF No. 173.) His bond was secured by a $500,000 lien on his home, which was later reduced to $250,000. (ECF Nos. 173, 566.) This reduction was done by stipulation of the parties and in recognition of Mr. Buntenbah's good behavior. He was also later taken off home confinement, with a curfew imposed instead. On July 15, 2021, Mr. Buntenbah was indicted in three counts of a 22-count Second Superseding Indictment. On March 17, 2022, Mr. Buntenbah entered a guilty plea as to Count 10 of the Second

Superseding Indictment. Since September of 2020, he had remained on pre-trial release without incident; Mr. Buntenbah had not committed a single violation in the nearly four years he was on bond.

The Bond Violation

Unfortunately, on January 20, 2024, Mr. Buntenbah engaged in an altercation with a known acquaintance (the victim) in a bar setting. The confrontation began as a verbal argument, with Mr. Buntenbah coming to the victim's table. (ECF No. 1315, Government's Motion, Ex. 1, Video at 0:02[1].) As Mr. Buntenbah and his group approached the table, Mr. Buntenbah appears to be agitated and speaking loudly at the people seated there. (*Id* at 0:02-0:19.) While the Government asserted in its Motion that Mr. Buntenbah called the victim a "rat," (ECF No. 1315, Government's Motion, PageID 12484), this assertion is based on a statement by the victim at the beginning of his interview that he later recanted at the end of his interview. In fact, when asked by the FBI to specifically confirm Mr. Buntenbah called him a "rat," the victim "changed his previous statement and stated Buntenbah did not call him a 'rat' during the assault." (FD-302, 01/25/2024, p.3.)[2]

It is also worth clarifying that Mr. Buntenbah was not the first person to initiate physical contact with the victim or the other men seated at the table. Rather,

---

[1] Like the Government's motion, all timestamps refer to the timestamps on a video player, not as embedded in the video file itself.
[2] Mr. Buntenbah does not attach the FD-302 here to avoid any confidentiality issues, but can present it to the Court upon request.

the video shows Mr. Buntenbah initially restraining the people he was with, putting his arm up to stop another member of the group from approaching the victim. (ECF No. 1315, Government's Motion, Ex. 1, Video at 0:20.) Then, after Mr. Buntenbah's son throws the first punch, Mr. Buntenbah again quickly puts his arm out in an apparent attempt to signal him to stop. (*Id*. at 0:27.) Mr. Buntenbah can also be seen in the video hesitating to get physically involved in the altercation. (*Id*. at 0:27-0:30.) After a few seconds, though, Mr. Buntenbah joins the ongoing fight. (*Id*. at 0:31.) He can be seen physically fighting with both men at the table for approximately ten seconds before he is restrained by either security or a patron of the bar. (*Id*. at 0:32-0:44).

Based on that conduct, Mr. Buntenbah anticipated that his bond would be revoked. On January 30, 2024, he voluntarily appeared at a meeting with U.S. Probation, fully expecting to be arrested. Indeed, he was arrested, he was charged with the bond violation, and the Government subsequently moved for forfeiture of the entire $250,000 bond amount. (ECF No. 1315.)

### III. LAW AND ARGUMENT

Well-settled case law regarding forfeiture weighs in favor of returning at least some of Mr. Buntenbah's bond. The Federal Rules provide that forfeiture after a bond violation is mandatory, but the Court "may direct that a forfeiture be set aside in whole or in part . . . if it otherwise appears that justice does not require the

5

forfeiture." Fed. R. Crim. P. 46(f)(2)(B); *see Nguyen*, 279 F.3d at 1115. There are six factors for the Court to consider in determining whether to set aside the forfeiture:

> 1) the defendant's willfulness in breaching a release condition; 2) the sureties' participation in apprehending the defendant; 3) the cost, inconvenience, and prejudice suffered by the government; 4) mitigating factors; 5) whether the surety is a professional or a member of the family or a friend, and 6) the appropriateness of the amount of the bond.

*Id.* at 1115-1116 (citing *United States v. Amwest Sur. Ins. Co.*, 54 F.3d 601, 603 (9th Cir. 1995).

Several of the six factors weigh heavily in favor of setting aside the forfeiture, either in part or in whole. Regarding the first factor, while the Government argues that Mr. Buntenbah "willfully violated this condition when he perpetrated an unprovoked, vicious personal attack against a third party in a public restaurant," the video evidence shows that the situation started much differently. (ECF No. 1315, Government's Motion, 7.) It is true that Mr. Buntenbah initiated a *verbal* confrontation, but—against his wishes—his associates, including Mr. Buntenbah's sons, began the physical fight. It is clear from the video that Mr. Buntenbah initially stopped his associate from assaulting the victim, and he hesitates significantly before entering the fight. (*Id* at Ex. 1, Video at 0:02-0:30.) This initial attempt at restraint should weigh in favor of Mr. Buntenbah, indicating that the violation was not as "willful" as the Government argues. It is also distinguishable from many other

6

forfeiture cases—especially those involving the defendant fleeing—where the bond violation is premeditated, planned, and executed to take the defendant out of the jurisdiction. *United States v. Abernathy*, 757 F.2d 1012, 1014 (9th Cir. 1985) (defendants fled from Arizona to Tennessee); *United States v. Stanley*, 601 F.2d 380, 381 (9th Cir. 1979) (defendants fled from northern California to Maine).

There was no surety in this case, thus making the second factor moot. That said, after this incident, Mr. Buntenbah was in close contact with his counsel and with U.S. Probation. Expecting that he would be arrested, Mr. Buntenbah still attended a meeting with U.S. Probation.[3] He posed no issues to the Government in apprehending him after the violation. This weighs in his favor.

The third factor—the cost, inconvenience, and prejudice suffered by the government—weighs *heavily* in favor of setting aside the forfeiture. Given Mr. Buntenbah's voluntary appearance where he knew an arrest was imminent, there was no substantial cost, inconvenience, or prejudice suffered by the Government as a result of this violation. The Government admits as much in its Motion. (ECF No. 1315, Government's Motion, 9.) While it is true that a lack of actual costs does not "mandate" remission, *United States v. Amwest Sur. Ins. Co.*, 54 F.3d 601, 603 (9th Cir. 1995), that does not mean that the Court should ignore this factor entirely. A

---

[3] Notably, U.S. Probation lured Mr. Buntenbah to their office under false pretenses, telling him that the band on his tether needed to be replaced—a band that was replaced only a few weeks before. Knowing that this was a fabrication and that an arrest was likely imminent, Mr. Buntenbah still voluntarily appeared at the meeting.

7

main purpose of the bond arrangement is to ensure the defendant's appearance. *United States v. Toro*, 981 F.2d 1045, 1049 (9th Cir. 1992). Here, Mr. Buntenbah made concerted efforts to make himself available to the Government, even when he knew the likely consequences of surrendering himself after a bond violation. This should not go unrecognized, and it weighs in favor of setting aside at least a substantial portion of the bond forfeiture.

Regarding the fourth factor—mitigating circumstances—Mr. Buntenbah recognizes that his confrontation of the victim was intentional. Nevertheless, it is simply untrue that, as the Government says, "[t]he Defendant (bringing with him numerous associates as backup) instigated a violent and unprovoked assault against a victim." (ECF No. 1315, Government's Motion, 10.) As the video shows, Mr. Buntenbah did not start a physical confrontation at all, much less with "numerous associates as backup" for a physical fight. (*Id*. (emphasis added); *id* at Ex. 1, Video at 0:02-0:31.) Rather, he is seen initially stopping members of his group from stepping up to the victims. (ECF No. 1315, Government's Motion, Ex. 1, Video at 0:20-0:30.) The verbal confrontation became physical when his sons and other associates went too far—and Mr. Buntenbah went too far by joining them—resulting in conduct that would likely be classified as a misdemeanor assault. This is Mr. Buntenbah's first violation during his nearly four years on pre-trial release; he has

8

otherwise been helpful and compliant. The mitigating circumstances surrounding the incident therefore weigh in Mr. Buntenbah's favor.

Another mitigating factor is the history between Mr. Buntenbah and the victim. The Government leads the Court to believe that Mr. Buntenbah called the victim a "rat" for his past or current involvement in the instant case. (ECF No. 1315, Government's Motion, 3.) First, as noted above, the victim ultimately denies that Mr. Buntenbah ever called him a rat. (FD-302, 01/25/2024, p.3) Mr. Buntenbah has reported, however, that the victim has called *him* a rat, or snitch, for his cooperation in the case against Mr. Miske. As the Court is aware, there is serious danger implicit in this sort of name-calling and insinuation, particularly in this case, where there is risk of retaliation. It is no surprise then, given the risks already associated with testifying about the Miske enterprise, that Mr. Buntenbah was put on-edge when the victim accused him of being a snitch. Additionally, the victim at one time threatened to kill Mr. Buntenbah. Mr. Buntenbah, during his regrettable association with Mr. Miske, once had a run-in with the victim's cousin. In retaliation, the victim threatened Mr. Buntenbah's life. While no one should be confronted and attacked like the victim was, the history is not as simple as the Government implies. (ECF No. 1315, Government's Motion, 7 (saying the "the victim was peacefully seated and having drinks").)

Of course, neither calling Mr. Buntenbah a "snitch" nor a years-old threat provides justification for the confrontation. But it is a mitigating factor, given the tremendous pressure under which Mr. Buntenbah finds himself, both by being a witness and as a result of trying to run his business in Hawaii. Mr. Buntenbah was extremely agitated by what he believed to be threatening conduct by the victim. The verbal confrontation (unfortunately turned physical) is therefore not entirely without cause. And it is certainly not the sort of premeditated, unprovoked targeting that the Government describes. (*Id.*) Mr. Buntenbah does not deny the seriousness of the violation here, but the Court should be fully apprised of the reality of this complex situation and not be swayed by the Government's overstatement of Mr. Buntenbah's intentions.

There was no professional surety relating to the fifth factor.

Regarding the sixth factor, Mr. Buntenbah recognizes that the Court initially set bond at $500,000 and, with the stipulation of the parties, later reduced bond to $250,000. Generally, courts should determine whether bond was reasonable at the time it was set. *Amwest Sur. Ins. Co.*, 54 F.3d at 604. The stipulation of the parties indicates that bond was reasonable. And it may have been reasonable given the risk that Mr. Buntenbah could have left the island and absconded. But it can hardly be said that $250,000 is a reasonable penalty for a single lapse in judgment resulting in minor injuries—the only such lapse in the nearly four years that Mr. Buntenbah has

been out on bond. To punish one violation with forfeiture of $250,000 simply is not proportional to the incident. Justice therefore requires that the Court set aside forfeiture of the bond amount in whole or in part.

## IV.  CONCLUSION

Given the six factors appropriately considered in setting aside the forfeiture, Mr. Buntenbah respectfully asks the Court to set aside the forfeiture of his bond amount, either in part or in whole.

Dated: February 21, 2024          */s/ Gary K. Springstead*_____
                                                    GARY K. SPRINGSTEAD
                                                    Counsel for Defendant
                                                    60 Monroe Center St., N.W., Suite 500
                                                    Grand Rapids, Michigan 49503
                                                    Tel: (616) 458-5500
                                                    gary@sbbllaw.com

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.4

This response is less than 25 pages, contains 2,691 words, and is under the 6,250-word limit imposed by LR7.4(b).

Dated: February 21, 2024  /s/ Gary K. Springstead
GARY K. SPRINGSTEAD
Counsel for Defendant
60 Monroe Center St., N.W., Suite 500
Grand Rapids, Michigan 49503
Tel: (616) 458-5500
gary@sbbllaw.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served electronically through CM-ECF.

Dated: Grand Rapids, Michigan, February 21, 2024

                                                       */s/ Gary K Springstead*
                                                       GARY K. SPRINGSTEAD
                                                       Counsel for Defendant
                                                       60 Monroe Center St., N.W., Suite 500
                                                       Grand Rapids, Michigan 49503
                                                       Tel: (616) 458-5500
                                                       nicole@sbbllaw.com